1

2

3

4

5          **UNITED STATES DISTRICT COURT**

6          **EASTERN DISTRICT OF CALIFORNIA**

7

8    **AMY J. McDANIEL,**                      **CASE NO. 1:12-CV-2028 AWI JLT**

9              **Plaintiff**

10          **v.**                             **ORDER ON CROSS-MOTIONS FOR
                                               SUMMARY JUDGMENT**

11   **GEICO GENERAL INSURANCE
     COMPANY, and DOES 1-100 inclusive,**

12                                             (Doc. Nos. 28, 29)

             **Defendants**
13

14

15          This is an insurance dispute between Plaintiff Amy McDaniel ("McDaniel") and GEICO

16   General Insurance Co. ("GEICO").  McDaniel is the assignee of a bad faith failure to settle claim

17   against GEICO.  Both parties bring cross-motions for summary judgment.  For the reasons that

18   follow, GEICO's motion will be denied and McDaniel's motion will be granted.

19

20                      <u>**FACTAUL BACKGROUND**[1]</u>

21          In 2008, Edward Murotani ("Murotani") was diagnosed with diabetes.  <u>See</u> PUF 1.  On

22   June 11, 2008, Murotani purchased an automobile insurance policy ("the Policy") for his Nissan

23   Altima from GEICO.  <u>See</u> JUF 1.  The Policy was in effect on October 25, 2008, and provided

24   bodily injury liability limits of $100,000 per person and $200,000 per occurrence.  JUF 2.

25          On October 25, 2008, Murotani was driving his Altima when he became confused and

26   light-headed.  <u>See</u> PUF 2.  Murotani continued to drive even though he knew he was likely having

27

28   ───────────────
     [1] "JUF" refers to the parties' "Joint Undisputed Fact," "PUF" refers to "Plaintiff's Undisputed Fact," and "DUF"
     refers to "Defendant's Undisputed Fact."

1    a diabetic episode.[2]  See id.  Murotani had prior episodes of low blood sugar, so he recognized

2    those feelings.  See PUF 4.  Eventually, Murotani drove his Altima onto the wrong side of a

3    divided highway against the flow of on-coming traffic, and came to a stop after hitting a sign post.

4    JUF 3; see PUF 5.  At one point, Murotani hit something and his car began to smoke.  PUF 6.

5    Murotani eventually was helped out of his smoking car.  See id.  Murotani essentially admitted in

6    his deposition that the accident was his fault since his car ended up on the wrong side of the road

7    after he continued driving when he knew he was having a diabetic episode.  See PUF 7.  A fire

8    started in Murotani's Altima, and created a large smoke field that obscured on-coming drivers'

9    views of the accident scene.  JUF 4.  McDaniel's husband, Steven McDaniel, had stopped and

10   gotten out of his vehicle to try to put out the fire.  JUF 5.  As Steven McDaniel tried to put the

11   flames out from Murotani's car, another driver went into the smoke and crashed into Murotani's

12   car, which caused Murotani's car to fatally push into Steven McDaniel.  See PUF 8.

13        On January 23, 2009, a liability claim file was opened by GEICO to handle the claims

14   relating to Murotani's October 25, 2008, accident.  See JUF 6.

15        On March 3, 2009, McDaniel filed a wrongful death suit against Murotani and others in

16   Kern County Superior Court.  JUF 7.  On April 22, 2009, GEICO referred the handling of the

17   lawsuit to attorney Michael Griott ("Griott"), who was a GEICO employee.[3]  See JUF 8; Griott

18   Dec. ¶ 2.  The GEICO claims person assigned to handle the McDaniel wrongful death lawsuit

19   against Murotani was Aldin Buenaventura ("Buenaventura"), and the claim was given a claim

20   number.  See JUF 9.  GEICO provided a defense to Murotani through Griott.  JUF 10.

21        On March 4, 2009, Buenaventura made a log entry that discussed information and facts

22   known about the October 25 accident and a plan for future action.  See Plaintiff's Ex. 4; PUF 9.

23   In relevant part, the log entry states: "insureds losing control of his vehicle appear to be clear

24   liability," and "I will place the insured on notice of the potential excess exposure of bodily injury."

25   PUF's 9, 10.

26

27   [2] On one other occasion, Murotani had become dizzy while driving.  See PUF 3.

28   [3]Griott was an attorney with the Beverly Mills Law Firm, but is now retired from the practice of law.  See Griott Dec.
¶ 1; GEICO Ex. 4.

On March 5, 2009, GEICO advised Murotani that every effort to settle all claims within policy limits would be made.  See PUF 11.

On May 6, 2009, Loyd Asuncion (a co-defendant in McDaniel's wrongful death suit) served special interrogatories on McDaniel.[4]  See PUF 13.  In many instances, Asuncion's interrogatories sought the same information as that sought by Murotani in his special interrogatories to McDaniel.  See id.

On May 19, 2009, Griott provided GEICO with the liability information necessary to determine fault.  PUF 15.  The report discusses Murotani's previous diabetic episodes while driving, establishing Murotani's knowledge of the danger.  See id.  Griott advised the GEICO claims department that Murotani caused the series of collisions when Murotani suffered a diabetic episode, that the collisions culminated in the death of Steven McDaniel, and that this was a "case for settlement."  See id.

On July 1, 2009, McDaniel provided verified answers in response to Loyd Asuncion's interrogatories.  See Plaintiff's Ex. 15; see also PUF 30.  McDaniel served a copy of these responses on all counsel, including Griott.  See PUF 31; McDaniel Ex. 15.  As part of her responses, McDaniel indicated that Steven McDaniel's income was between $60,000 and $75,000 per year.  See PUF 32.  McDaniel also responded that she had been married to Steven McDaniel for 30 years.  See Plaintiff's Ex. 15; see also PUF 33.

On August 7, 2009, McDaniel's attorney Steve Nichols ("Nichols") wrote a letter to Griott in which he demanded settlement for the Policy's $100,000 limit, and set a deadline of 15 days from the date of the letter for acceptance.  See JUF 11.  The demand letter mistakenly referred to GEICO's insured as having run over Steven McDaniel, and was incorrect in that regard.  Id.

On August 10, 2009, Nichols hand delivered the August 7 letter to Griott while they were both in attendance at a deposition.  See Griott Dec. ¶ 4.  Nichols agreed in a conversation with Griott to extend the deadline for acceptance of plaintiff's $100,000 settlement demand to a new date of 10 days following McDaniel's service of responses to discovery that had previously been

---

[4] One day earlier, on May 5, 2009, Jerry Bollinger filed a lawsuit against Murotani  for negligence in connection to the October 25 accident.  See Plaintiff's Exs. 4, 6; PUF 12.

1    served by Murotani.  JUF 12.  As of August 10, 2009, the only pending discovery that had

2    previously been served by Murotani upon McDaniel was a set of special interrogatories.  JUF 13.

3         On August 11, 2009, an e-mail from Griott's law firm was sent to Buenaventura informing

4    him of the August 7 policy limits demand letter.  See GEICO Ex. 4.  The e-mail indicated that a

5    copy of the policy limits letter would be faxed to Buenaventura.  See id.

6         On August 12, 2009, Buenaventura spoke with Nichols's assistant about the error in the

7    August 7 letter.  DUF 13.A.

8         On August 13, 2009, Nichols sent a corrected letter to Griott indicating that McDaniel was

9    demanding the policy limits, but correctly referring to Murotani as the one who was driving the

10   wrong way on the freeway.  JUF 14.  This letter indicated that a response was due "within 15 days

11   of the date of this letter."  See PUF 29.

12        On August 27, 2009 at a deposition, Nichols hand-delivered McDaniel's interrogatory

13   responses to Griott.  JUF 15; Griott Dec. ¶ 8.  The interrogatory responses did not include a

14   "Verification" signed under oath by McDaniel.  JUF 16.  The interrogatory responses included a

15   sheet of paper that said, "Verification to Follow."  JUF 17.  Griott summarized the interrogatory

16   responses as indicating that Steven McDaniel had been married for 30 years, was making about

17   $60,000 per year, was in excellent health, and was not under the care of any doctors at the time of

18   death.  See Plaintiff's Ex. 16.

19        On September 1, 2009, Griott's assistant, Lynda Page, sent an e-mail with an attached

20   letter from Griott to Buenaventura.  See JUF 18.  The e-mail described the attachment as "our

21   depo summaries of Edward Murotani and Co-Defendant, Lloyd Asuncion."  See DUF 18.C.  In

22   the attached letter, Griott provided summaries of the recent depositions of Murotani and Lloyd

23   Asuncion and stated at the end of the letter that he had received McDaniel's discovery responses

24   and that the responses to the insurance policy limit demand of $100,000 was due on September 11,

25   2009.  See JUF 18; see also PUF 34.[5]  In bold and underlined text, the letter states that the time to

26   respond to McDaniel's demand would run as of September 11, 2009.  See PUF 34.  Griott had not

27
     _____
28   [5] GEICO disputes this fact by making arguments relating to why Buenaventura did not read Griott's letter.  See
     Response to PUF 34.  No actual dispute is created.  PUF 34 simply describes the content of Groitt's letter.  Nothing in
     GEICO's lengthy response disputes the content of the letter.

1   noticed that the interrogatory responses served by Nichols did not contain a verification under oath

2   signed by McDaniel.  DUF 18.A.  Griott's letter also states that, "We will be held in liability on

3   this matter.  This case has a minimal value of at least $500,000."  PUF 35.  Buenaventura had

4   already had a phone conversation with Griott in which Griott had briefly summarized key points

5   of two recent depositions.  DUF 18.D.  Buenaventura declares that, as a result of the phone

6   conversation, Buenaventura did not read any portion of Griott's September 1 letter, including the

7   statements at the very end about Griott's receipt of discovery responses from McDaniel or Griott's

8   belief that the deadline for accepting the policy limits demand would run on September 11, 2009.

9   See id.; Buenaventura Dec. ¶ 16.  Buenaventura did not realize that any interrogatory answers had

10   been received, whether verified or unverified, and therefore was not aware that a 10-day deadline

11   for acceptance of McDaniel's $100,000 offer had begun to run.  DUF 18.E.  Buenaventura noted

12   on his September 4, 2009, log entry that McDaniel's attorney had granted an extension of the

13   policy limits offer "until 10 days following responses to discovery," and that "the discovery

14   responses are overdue."  DUF 18.F.

15        On September 9, 2009, Buenaventura had a phone call with Nichols on the topic of

16   settlement.  DUF 18.G.  After the call, Buenaventura continued to believe that McDaniel's

17   discovery responses were overdue and that the policy limits offer was still open.  See id.

18   Buenaventura noted in his case log:  "I received call from P-atty Office; *[spoke with] Steve

19   Nichols*; P-atty admits sending wrong demand letter to our office.  I explained that we are

20   looking to determine the total amount exposures for this loss.  Our office has not been presented

21   with any responses to our requests to produce documentation.  Once we have the information we

22   will then be able to process and evaluate all claim.  P-atty [understands]."  Id.  Buenaventura's

23   reference to "responses to our requests to produce documentation" was his way of referring to

24   whatever discovery responses were due from McDaniel.  DUF 18.H.

25        On September 10, 2009, Buenaventura scheduled an appointment with his supervisor and

26   manager to begin the process of seeking authority to settle for the $100,000 policy limits, instead

27   of continuing to wait for discovery responses and be subject to a short 10-day acceptance deadline.

28   See DUF 18.I; Buenaventura Dec. ¶ 21.

On September 18, 2009, Buenaventura met with his supervisor and manager regarding the policy limits offer.  See DUF 18.J.  After the meeting, Buenaventura's manager, David Fetchina, made a case log entry noting that he had discussed the case with Buenaventura and his supervisor, Denise Lundgren, and agreed with the recommendation to tender the $100,000 policy limit for McDaniel's wrongful death claim.  See id.  Immediately after the meeting, Buenaventura called Griott and Nichols and left voice mail messages for them indicating that he had reviewed McDaniel's policy limits demand and would have a response by the first part of the following week.  DUF 18.K.  Buenaventura received no return call from Nichols in response to the September 18 message.  See DUF 18.L.  Also, Buenaventura did not read Griott's September 1 letter until September 18, 2009, but did not read the portion of the letter relating to the time limit for McDaniel's policy limits demand.  See PUF 36; Buenaventura Depo. 64:15-67:10.

Authority from Mike Stup of GEICO's home office legal department (who was a level above David Fachina) was needed in order for GEICO to pay the $100,000 policy limits.  See DUF 18.M.  David Fachina's case log entry for September 18 was e-mailed to Mike Stup.  See DUF 18.N.

On September 21, 2009, Stup responded with his own case log entry, in which he agreed generally with the proposed per person $100,000 settlement, but expressed concern over having enough money under the $200,000 per accident limit to settle all claims, due to a possible "Dillon v. Legg" bystander claim by McDaniel for having witnessed the death of her husband.  See DUF 18.O.  Stup wrote:  "I have no problem extending the single limit to the estate but want to make sure that we have adequate funds for the remaining claims including Mrs. McDaniel."  Id.  Accordingly, the final step before GEICO could agree to pay the $100,000 demand was to confirm that any "Dillon v. Legg" claim would be included in the release.  See DUF 18.P.  Between September 24 and October 1, Buenaventura obtained confirmation through communications with Griott's assistant and the supervising attorney in Griott's office.  See id.

On October 1, 2009, Buenaventura e-mailed Mike Stup and advised that he received a message from defense indicating they had confirmed the $100,000 demand was for "all McDaniels."  DUF 18.Q.  Buenaventura then recommended accepting the offer "inclusive of all

liens." See id. Stup responded 22 minutes later, "OK to proceed as suggested." DUF 18.R. At 5:13 p.m. on October 1, 2009, Buenaventura called and spoke with Griott, advised him that GEICO would pay $100,000 to settle the claims of the McDaniels and that he (Buenaventura) would call Nichols to find out if a single check or multiple checks were needed. See DUF 18.S.

On October 1, 2009, Buenaventura telephoned Nichols and offered, for the first time, to settle all of the McDaniel family claims for the Policy's policy limits of $100,000.00. See JUF 19. During the October 1, 2009, phone conversation, Nichols declined GEICO's offer to settle the claims against Murotani for $100,000 and took the position that GEICO's acceptance deadline had previously passed. JUF 20. McDaniel contends that the deadline for acceptance of her policy limits offer was September 6, 2009, which her attorneys calculated as the date that is 10 days after Nichols hand-served McDaniel's unverified responses to Murotani's interrogatories. See JUF 21.

On October 2, 2009, Buenaventura sent a letter to Nichols in which he said: "This letter will confirm our telephone conversation yesterday. Our office has agreed to tender the per person policy limit of $100,000 to settle the claims of your clients, the McDaniel family. Your office is unwilling to accept the offer to resolve the matter." JUF 22. The same day, Nichols wrote to Buenaventura indicating that the policy limits offer made in the August 7 letter was not accepted by GEICO within the time specified so that the policy was open to excess judgment. PUF 38.

On October 7, 2009, Buenaventura's supervisor, Denise Lindgren, spoke with Griott, who informed her that the interrogatory responses served by Nichols, were not verified and that Griott viewed them as incomplete and insufficient to cause the acceptance deadline to run on McDaniel's $100,000 settlement offer. JUF 23. By October 7, Griott had come to realize that the interrogatory answers were not verified, and he considered them to be incomplete, and thus insufficient to trigger the 10-day settlement deadline. DUF 18.B. McDaniel never signed a verification under oath as part of her answers to Murotani's interrogatories. See DUF 23.A.

Murotani died on March 12, 2010. JUF 24. At the time of his death, Murotani had a JP Morgan Chase Bank account worth $10,112.00. PUF 39.[6]

---

[6] McDaniel also avers that Murotani had household furnishings worth $1,500 and firearms worth $2,500. PUF 40. GEICO objects that the document upon which PUF 40 is based is unauthenticated and hearsay. McDaniel did not

By August 12, 2010, McDaniel's attorneys had opened a probate case for the Estate of Edward Murotani ("the Estate"), had obtained a court order appointing Paulette Wren (a secretary in Nichols's law firm) as the administrator of the Estate, had filed a claim against the estate on behalf of McDaniel, and obtained a rejection of the claim.[7]  See JUF 25.  However, no assets of Murotani as of the date of his death ever came into the possession or control of Paulette Wren as administrator of the Estate.  DUF 31.

On August 12, 2010, McDaniel amended her complaint in the Kern County Superior Court case by naming the Estate, through administrator Paulette Wren, as a new defendant in place of the deceased Murotani.  See JUF 26.

On August 13, 2010, Leland Murotani ("Leland"), the brother of Murotani, signed a "Small Estate Declaration" for Chase Bank regarding Murotani's account.  See DUF 33.  Leland claimed the money in the Chase account and stated he was successor to his brother.  See id.  The same day, Chase wrote a cashier's check to Leland in the amount of $9,994.24, which represented all funds in the Chase account, leaving a zero balance.  See DUF 34.

On December 17, 2010, in the probate case regarding the Estate, McDaniel's attorneys filed an Inventory and Appraisal, marked as "Final."  JUF 29.  This document listed estate assets totaling $10,112.00 described as:  "Item 1 – 'JP Morgan Chase Bank Account . . . balance of $10,112.00."  See id.

On August 16, 2011, a judgment was filed in the Kern County Superior Court case in favor of McDaniel and against the Estate for $3,067,741.00.  JUF 27.  In this Court, McDaniel sues GEICO as an assignee of the rights and claims of the Estate against GEICO.  See JUF 28.

On November 14, 2011, in the probate case regarding the Estate, McDaniel's attorneys filed an Inventory and Appraisal marked as "Supplemental."  See JUF 30.  This document listed estate assets totaling $52,000.00 described as:  "Item 1 – 'Miscellaneous home furniture and furnishings and electronic equipment,'" with an alleged value of $2,500; and "Item 2 – 'Various

---

respond to these objections.  In the absence of a response, the Court sustains the objections, and will not consider PUF 40 in resolving the cross-motions.

[7] It appears that the probate process for the Estate began on May 10, 2010.  See Plaintiff's Ex. 25.

1   Annuities and Life Insurance Policies with American Funds Service Company, the Hartford Life

2   Insurance and Pacific Life Insurance Company,'" with an alleged value of $50,000.00.  See id.

3        Murotani had purchased the Pacific Life annuity in 1995.  See DUF 35.  As part of the

4   application to purchase the annuity, Murotani designated his brothers Leland and Ronald Murotani

5   ("Ronald"), and his sister Susan Koulos, as the primary beneficiaries.  See DUF 36.  The first

6   statement following Murotani's death showed a variable annuity contract with a value of

7   $37,961.08 and a death benefit of $41,439.18 (as of March 31, 2010).  See DUF 37.  In July 2010,

8   Ronald and Susan Koulos submitted claimant statements to Pacific Life for shares in Murotani's

9   annuity.  See DUF's 38, 41.  On July 20, 2010, Pacific Life issued checks to Ronald and Susan

10  Koulos.  See DUF's 39, 42.  The gross amount of each of Ronald and Susan Koulos's respective

11  shares was $13,813.06.  See DUF's 40, 43.  In January 2012, Leland filed a claimant statement

12  with Pacific Life for a share in Murotani's annuity.  See DUF 44.  On February 1, 2012, Pacific

13  Life issued a check to Leland.  See DUF 45.  The gross amount was $16,340.92.  See DUF 46.

14

15                          **<u>SUMMARY JUDGMENT FRAMEWORK</u>**

16        Cross motions for summary judgment are evaluated separately under the same standards

17  that apply to single summary judgment motions.  See Pintos v. Pacific Creditors Ass'n, 565 F.3d

18  1106, 1111 (9th Cir. 2009); ACLU v. City of Las Vegas, 466 F.3d 784, 790 (9th Cir. 2006).

19  Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to

20  any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

21  P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

22  Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears

23  the initial burden of informing the court of the basis for its motion and of identifying the portions

24  of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

25  issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty

26  Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome

27  of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

28  (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to

1    a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

2    moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d

3    509, 514 (9th Cir. 2010).

4          Where the moving party will have the burden of proof on an issue at trial, the movant must

5    affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

6    Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

7    issue at trial, the movant may prevail by presenting evidence that negates an essential element of

8    the non-moving party's claim or by merely pointing out that there is an absence of evidence to

9    support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert

10   Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party

11   fails to carry its burden of production, then "the non-moving party has no obligation to produce

12   anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

13   Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

14   meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

15   issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio

16   Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest

17   upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

18   forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope

19   Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

20         The opposing party's evidence is to be believed, and all justifiable inferences that may be

21   drawn from the facts placed before the court must be drawn in favor of the opposing party. See

22   Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

23   (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

24   inference, a "justifiable inference" must be rational or reasonable.  See Narayan, 616 F.3d at 899.

25   Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

26   factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551

27   F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993,

28   997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because

1   a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen

2   Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health

3   System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment

4   may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"

5   Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).

6   If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material

7   fact, the moving party is entitled to summary judgment.   Nissan Fire, 210 F.3d at 1103.

8

9                                        **CROSS MOTIONS**

10      *Plaintiff's Arguments*

11          McDaniel argues that she is entitled to summary judgment because GEICO engaged in bad

12   faith by breaching its duty to accept a reasonable settlement offer.  In California, the test is

13   whether a prudent insurer without policy limits would have accepted the settlement offer.  When

14   the insurer fails to accept a reasonable offer when liability and coverage is clear, then the insurer

15   will be liable for any excess judgment.  Here, as early as August 7, 2009, a policy limits offer to

16   settle was made to GEICO.  By that time, GEICO knew from its knowledge of Steven McDaniel,

17   Murotani, and the facts of the case that the value of McDaniel's claim was well in excess of

18   $100,000.  Instead of accepting McDaniel's offer, GEICO let the offer lapse.  Not until October 1,

19   2009, did GEICO attempt to settle the matter for the policy limits, by which time the offer had

20   expired.  Although GEICO claims that it was concerned about other claims being made against the

21   $200,000 per incident limit, Buenaventura admitted that between August 7 and October 1, 2009,

22   he learned nothing new about other potential claims that permitted him to make the $100,000 offer

23   on October 1.

24          McDaniel argues that it is irrelevant whether her August 27, 2009 discovery responses to

25   GEICO were verified.  Griott took the position that the clock was running on the offer when he

26   was given the responses.  The significance of the discovery responses was not whether they were

27   considered complete under Code of Civil Procedure § 2030, rather the significance of the response

28   was to start the 10 day deadline.  It was clearly understood by the parties that the discovery

responses started the clock.  Further, if GEICO is going to rely on technicalities concerning discovery responses, then technically the last operative offer was done through the August 12, 2009 letter that was faxed to GEICO, because that offer acted as a withdrawal of the August 7 offer.  The terms of the August 12, 2009, offer expired fifteen days from August 7, i.e. August 22. GEICO did not accept the offer by that time.

McDaniel also argues that the case of *Shapero v. Allstate Ins. Co.*, 14 Cal.App.3d 433 (1971) stands for the limited proposition that an estate that has no assets cannot be damaged by an insurer that fails to protect the interests of the estate.  However, *Shapero* by its own terms was limited by its facts, and this case is factually different from *Shapero*.  Here, Murotani was still alive at the time the acts of bad faith occurred against him, and the Estate had at least $10,000 in assets in the form of the Chase bank account.

Finally, in reply, McDaniel argues that no valid contract to settle for the Policy's limits was created at trial.  Although this possibility was discussed, McDaniel herself refused to agree to the settlement, and GEICO did not perform all of its obligations under the proposed bargain.

### *Defendant's Arguments*

GEICO argues that it is entitled to summary judgment for several reasons.  First, GEICO argues that it did not refuse to accept McDaniel's settlement offer.  McDaniel's August 27, 2009 discovery responses are not verified.  California law holds that unverified discovery responses are tantamount to no discovery responses at all.  As a matter of law, the August 27 unverified discovery responses were not actually responses.  Because they were not actually responses, the August 27 papers did not trigger the 10-day acceptance deadline, which made GEICO's October 1 acceptance timely.  Moreover, the log entries of Buenaventura indicate that he was unaware of McDaniel's August 27 responses and that he was attempting to settle the case.  Thus, GEICO did not fail to accept a reasonable settlement offer.

Second, even if the unverified August 27 responses did start the 10-day deadline, GEICO argues that it did not engage in bad faith or put its interests above Murotani's.  At best, the evidence reflects negligence by Buenaventura in not reading the September 1 letter from Griott, or by Griott's miscalculation of the deadline after receiving the August 27 responses.  Liability is

1    predicated on bad faith, it cannot be predicated on negligence.

2          Third, even if bad faith is found, the Estate suffered no damages, which means that

3    McDaniel cannot recover.  Under California law as reflected in *Shapero*, an insolvent estate that

4    becomes subject to an excess judgment due to the insurer's unreasonable refusal to settle has no

5    bad faith claim because the estate has no interests to be damaged.  At the time McDaniel obtained

6    her judgment, Murotani's brother had already obtained the funds from the Chase account, two of

7    Murotani's siblings obtained their 2/3's share of the Pacific Life annuity, and Murotani's other

8    brother obtained the remainder of the annuity in early 2012 after submitting a claim, although the

9    brother had rights to the annuity the day Murotani died.  Therefore, the Estate had no assets the

10   day that McDaniel obtained her judgment, and the rule of *Shapero* applies.  The fact that Murotani

11   was alive at the time McDaniel's offer was made and when GEICO attempted to accept it

12   (between August and October 2009) does not matter because no judgment against Murotani had

13   been entered.  A cause of action for bad faith failure to settle does not accrue until the insurer's

14   conduct results in an actual judgment that is beyond policy limits.

15         Fourth, even if the Estate had assets, GEICO's liability should be limited to the amount of

16   assets that the Estate had at the time of judgment.  Although no California cases have directly

17   addressed this issue, the logic of *Shapero* and California policy considerations support such a

18   conclusion.  *Shapero* held that an estate with no assets cannot be damaged, and California law

19   only permits liability against an estate up to the value of the assets of the estate.  Taken together,

20   the value of the estate sets the liability cap.  Anything above the value of the estate would

21   represent an improper windfall.

22         Additionally, as part of its opposition, GEICO argues that it accepted an offer from

23   McDaniel's attorney to settle for the Policy's limits towards the end of the trial.  McDaniel's

24   attorney stated that, if GEICO agreed to support a request that CACI jury instruction 434 be given,

25   then McDaniel would accept the $100,000 policy limits.  GEICO agreed and Griott supported

26   McDaniel's request for CACI 434.  However, McDaniel's counsel later said that McDaniel

27   refused to accept the offer.  Even if McDaniel's counsel did not have actual authority, he had

28   apparent authority that was relied upon by GEICO.  Because GEICO had agreed to the offer and

1 performed, McDaniel should not be permitted to seek additional benefits.

2 _Discussion_

3 There are essentially five issues raised by the parties.  The Court will address each of these

4 issues separately.

5 1.   Trial Settlement

6 There is no dispute that during the wrongful death trial in Bakersfield, further settlement

7 discussions were held.  Part of the proposed settlement was that McDaniel would accept the

8 $100,000 policy limits from GEICO, and GEICO would support McDaniel's request for the trial

9 court to give the CACI No. 434 jury instruction.  The parties agree that some form of CACI No.

10 434 was given, and that GEICO agreed that CACI No. 434 should be given.  There appears to be a

11 dispute about whether other terms of the proposed settlement were agreed upon, and whether

12 GEICO performed all of its obligations under the proposed settlement.  However, there is a more

13 fundamental problem than the precise terms of the "in-trial settlement."

14 GEICO raised the issue of the in-trial settlement in opposition to McDaniel's summary

15 judgment motion.  GEICO specifically noted that McDaniel was trying to repudiate the in-trial

16 settlement by arguing _inter alia_ that "Ms. McDaniel did not authorize us to finalize the settlement

17 agreement with Griott."  Doc. No. 30 at 18:16-18.  The issue of whether Nichols or Thomas Brill

18 ("Brill") (another one of McDaniel's attorneys) had McDaniel's authorization to enter into such a

19 settlement agreement with GEICO is critical.

20 An attorney "has the authority to enter into stipulations binding on the client in all matters

21 of procedure, though he or she may not stipulate in a manner to 'impair the client's substantial

22 rights or the cause of action itself.'"  In re Horton, 54 Cal.3d 82, 94 (1991).  "[S]ettlement is such

23 a serious step that it requires the client's knowledge and express consent."  Levy v. Superior

24 Court, 10 Cal.4th 578, 583 (1995).  "Absent express authority, it is established that an attorney

25 does not have implied plenary authority to enter into contracts on behalf of his client."  Blanton v.

26 Womancare, Inc., 38 Cal.3d 396, 407 (1985); Toal v. Tardif, 178 Cal.App.4th 1208, 1222 (2009).

27 The California Supreme Court has explained:

28 An attorney is not authorized . . .  merely by virtue of his retention in litigation, to

14

"impair the client's substantial rights or the cause of action itself."  For example, "the law is well settled that an attorney must be specifically authorized to settle and compromise a claim, that merely on the basis of his employment he has no implied or ostensible authority to bind his client to a compromise settlement of pending litigation."  Similarly, an attorney may not "stipulate to a matter which would eliminate an essential defense.  He may not agree to the entry of a default judgment, may not . . . stipulate that only nominal damages may be awarded, and he cannot agree to an increase in the amount of the judgment against his client.  Likewise, an attorney is without authority to waive findings so that no appeal can be made . . . ."  Such decisions differ from the routine and tactical decisions which have been called "procedural" both in the degree to which they affect the client's interest, and in the degree to which they involve matters of judgment which extend beyond technical competence so that any client would be expected to share in the making of them.

Blanton, 38 Cal.3d at 404-05.

GEICO relies primarily on deposition excerpts from Nichols, Brill, and Griott in support of its argument.  However, GEICO's evidence does not indicate that Nichols and Brill had McDaniel's authorization to enter into the in-trial settlement.

In his deposition, Nichols testified in relevant part:

Q:      Was there ever any proposal by either you or Mr. Brill to Mr. Griott that he join in requesting CACI 434?

**A:      Yeah, it was my understanding that would be a part of what he would agree to do if our client was willing to do it.**

Q:      If you client was willing to do what?

**A:      Agree to the – what we're just discussing.**

Q:      What would your client have to agree to?

**A:      Accepting his policy limits.**

. . . . .

Q:      Is it your testimony that despite those discussions with Mr. Griott, no agreement or deal was ever reached?

**A:      Absolutely.  Never was.**

Q:      And that's because your client did not agree to that?

**A:      That's right.**

Q:      Okay.

**A:      And I don't think the terms were ever, you know, fully agreed to by Griott.**

Nichols Depo. 55:16-25, 57:10-19.

The deposition testimony of Brill was to similar effect.  In relevant part, Brill testified:

Q:     Okay.  And did you have further discrepancies with him [Griott] on the topic?

. . . . .

**A:     Well, I believe we discussed it once that I can recall.  And I may have talked to him a second time, but I don't remember for sure.  I know that we talked out in the hallway about the two issues that Steve Nichols mentioned, giving of the [CACI 434] instruction and him supporting us in our claims against Asuncion.  After that, I talked to my client about it.  She was not in agreement.  And I cannot remember if I ever conveyed that to [Griott] or not.  I believe I did, but I don't have a clear recollection of it.  That's why I'm not sure if we had one or two discussions.**

. . . . .

Q:     When you explained those two things to [Griott], was there also a discussion of what you client would do?

**A:     Yes.  And that would have been in exchange for Amy McDaniel and Melissa McDaniel agreeing to accept a $100,000 policy limit . . . no matter what the verdict – not no matter what the verdict.  If we got a favorable verdict.**

Q:     You told Mr. Griott that you would recommend that as a deal to your client?

**A:     Yes.**

. . . . .

Q:     Okay.  And at least in your mind there was not a deal yet because it was contingent upon your client approving it, correct?

**A:     Exactly.**

Q:     You believe that you made that known to Mr. Griott –

**A:     Yes.**

Q:     -- that it's something that you needed to get approval from your client in order to finalize?

**A:     I'm not sure if I put it in those words, but I told him I would recommend to my client if she would accept the settlement along those terms.**

Brill Depo. 10:5-13:3.  Earlier, Brill acknowledged that he had raised the idea with Griott of supporting the CACI No. 434 instruction in exchange for "something."  Id. at 9:13-18.

Finally, Griott testified in relevant part:

Q:     And in terms of -- how did the discussions about the settlement come about?

**A:     I recall you approaching me in the hallway just outside the doors of the law**

16

**library on the third floor of the courthouse.  Mr. Nichols was with you or came up very shortly after our discussion began.  You said that you were concerned that Judge Palmer was not going to give the instruction you wanted that you wanted to have me support you in your request for that instruction and assist in convincing the court that it had to be given in this case and in return for such assistance that your client would accept the [$100,000] single limit, which was still available as a full – in full satisfaction of any obligation on the part of the estate.**

. . . . .

Q:      And in the discussions, do you remember me saying anything about recommending that to my client as opposed to my client had already agreed to something of that nature?

A:      **Well, that – no, I don't recall either of those essentially.  I recall you basically saying that this is what you were willing to do, and I think, at that point, our discussions adjourned.**

        **I said I'd have to, you know, contact an examiner and relate the terms to him. Well, let me add.  Before that, my recollection is  -- I think that Mr. Nichols spoke up and said, "We'll have to get it."  And I said, "Okay.  You mean the court has to give the instruction?"**

Q:      Okay.

A:      **And he said or you said or both of you said yes.  That's it.**

Griott Depo. 83:20-85:14.

        The evidence presented clearly demonstrates that Brill and Nichols did not have McDaniel's authority to consummate the in-trial settlement.  Importantly, Brill's deposition shows that he told Griott that he would recommend the deal to McDaniel, which means that Brill told Griott in effect that he needed to obtain McDaniel's approval.  Griott has no recollection of that aspect of the settlement negotiations, but he does not deny Brill's testimony.  A failure to recall does not create a genuine dispute.  See Wysong v. City of Heath, 260 Fed.Appx. 848, 856 (6th Cir. 2008); FEC v. Toledano, 317 F.3d 939, 950 (9th Cir. 2002); FDIC v. National Union Fire Ins. Co., 205 F.3d 66, 75 (2d Cir. 2000); Dickey v. Baptist Mem'l Hosp., 146 F.3d 262, 266 n.1 (5th Cir. 1998); Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co., 580 F.Supp.2d 678, 689 n.5 (N.D. Ill. 2008).  Based on the evidence presented, Brill and Nichols did not have McDaniel's authorization to enter into the in-trial settlement, and Griott was so told.  Without McDaniel's authorization, there was no settlement or binding offer.

GEICO's reliance on the doctrines of apparent authority and promissory estoppel is misplaced. As to the apparent authority theory, the law in California is clear: an attorney has no implied power to settle a client's claims. See Blanton, 38 Cal.3d at 404-05, 407; Toal, 178 Cal.App.4th at 1222. GEICO has identified no conduct that would take this case out of the general rule of *Blanton*. Moreover, because Brill told Griott that approval from McDaniel was needed, there could be no apparent authority. With respect to promissory estoppel, GEICO cites no cases that are analogous to the facts in this case. *Aceves v. U.S. Bank, N.A.*, 192 Cal.App.4th 218 (2011) is a foreclosure case, and *Toscano v. Greene Music*, 124 Cal.App.4th 685 (2004) is failure to employ case. Neither of these cases have anything to do with offers to settle made by an attorney without the consent of his client. In any event, "detrimental reliance is an essential element of promissory estoppel," Youngman v. Nevada Irrigation Dist., 70 Cal.2d 240, 249-50 (1969), and GEICO has significant problems with this element. Brill told Griott that he needed McDaniel's approval, which defeats the element of detrimental reliance. Further, even if Brill did not so inform Griott, because *Blanton* makes clear that it cannot be assumed or implied that an attorney has the ability to settle merely because he is a party's attorney, it is unknown how there can be detrimental reliance. Finally, Griott testified that he believed that the CACI 434 instruction was supported by the facts, was necessary, and it would have been error to refuse to give the instruction. See Griott Depo. 96:5-97:1. If the instruction was legally necessary, it is unknown how Griott could have ethically argued against giving such an instruction. Since Griott believed that the CACI 434 instruction was necessary, there could be no detrimental reliance.

In sum, the evidence presented affirmatively shows that McDaniel did not authorize the in-trial settlement. Either Brill's express statements to Griott or the rule stated in *Blanton* show that there was no viable offer to settle, which makes GEICO's acceptance irrelevant. Summary judgment in favor of McDaniel on this issue is appropriate.

2.     Acceptance Of The August Offer

"The implied covenant of good faith and fair dealing imposes a duty on an insurer to accept a reasonable offer to settle a claim against its insured." Archdale v. American Int'l Specialty Lines Ins. Co., 154 Cal.App.4th 449, 464 (2007). As part of an offer of settlement, a

1   claimant has the right to set a time limit for acceptance of her offer.  Critz v. Farmers Ins. Grp.,

2   230 Cal.App.2d 788, 798 (1965);[8] Martin v. Hartford Accident & Indem. Co., 228 Cal.App. 2d

3   178, 185 (1964).  Depending on the circumstances, it may be a question for the jury whether an

4   insurer has "refused" an "offer," including whether the insurer could have acted in a different

5   manner in light of an offer's deadline.  Coe v. State Farm Mut. Auto. Ins. Co., 66 Cal.App.3d 981,

6   994 (1977).

7          The issue is whether McDaniel's settlement offer had lapsed by the time GEICO offered

8   its Policy's limits on October 1, 2009.  In March 2009, Buenaventura thought that this case might

9   be one of clear liability against Murotani and that an excess judgment was possible.  See PUF's 9,

10  10.  In May 2009, Griott advised GEICO that the case was one for settlement.  See PUF 15.  As of

11  August 10, 2009, GEICO was aware that McDaniel was attempting to make a policy limits offer.

12  See Griott Dec. ¶ 4; see also GEICO Ex. 4.  McDaniel's August 7 letter demanded the Policy's

13  limits, set a 15 day deadline, but contained an erroneous factual basis.  See JUF 11.  Despite the

14  erroneous factual basis, Griott spoke to Nichols on August 10, 2009, and Nichols agreed to extend

15  the deadline to 10 days after GEICO received McDaniel's responses to GEICO's interrogatories.

16  See JUF 12.  Without this extension, the August 7 offer would have expired on August 22, 2009.

17  See JUF 11.  Nichols sent a new demand letter to Griott with a corrected factual basis on August

18  13, 2009.  See JUF 14.  On August 27, 2009, Nichols hand delivered the interrogatory responses

19  that included a page stating that McDaniel's verification was to follow.  See JUF's 15, 17.  Griott

20  then informed Buenaventura through an e-mail with an attachment regarding deposition

21  summaries that the deadline had begun (although he included an incorrect expiration date).  See

22  JUF 18.  In the memo, Griott used underlined and bold text to state that the deadline had begun

23  and would run on September 11, 2009.  See PUF's 34, 35.  Griott did not notice the absence of a

24  verification until late September 2009, but if he had noticed the absence of the verification, he

25  would have sought clarification from Nichols.  See Griott Dec. ¶¶ 9, 12.  On October 1, 2009,

26  GEICO offered its policy limits, but Nichols refused and said that McDaniel's policy limits offer

27  had already expired.  See JUF's 19, 20.

28

---

[8] Disapproved on other grounds, Crisci v. Security Ins. Co., 66 Cal.2d 425, 430 (1967).

From the above, the Court does not see a genuine dispute regarding whether GEICO failed to accept McDaniel's offer.  The evidence shows that the deadline to accept the policy limits offer began to run on August 27, 2009, and GEICO did not accept the policy limits offer before the offer lapsed.

First, Nichols's October 1 response to Buenaventura confirms that he believed that the offer had lapsed because the deadline had begun on August 27.  Second, Griott understood that Nichol's delivery of the interrogatory responses on August 27 triggered the deadline.  Griott wrote to Buenaventura on September 1, 2009, and informed him in bold and underlined text that, because discovery responses had been received, the deadline had begun.  See PUF 34.  Griott was a GEICO employee, see JUF 8, and was the attorney of both Murotani and GEICO.  See Bank of America, N.A. v. Superior Ct., 212 Cal.App.4th 1076, 1090 (2013); Unigard Ins. Group v. O'Flaherty & Belgum, 38 Cal.App.4th 1229, 1236-37 (1995).  An attorney's knowledge, whether actually told to a client or not, is imputed to the client.  Herman v. Los Angeles County Metropolitan Transportation Authority, 71 Cal. App. 4th 819, 828 (1999).  Generally, so too is an employee's knowledge imputed to the employer, if the knowledge is within the scope of employment.  See Santillan v. Roman Catholic Bishop of Fresno, 163 Cal.App.4th 4, 10-12 (2008); 3 Witkin, Summ. Cal. Law -- Agency §§ 150, 151 (10th ed. 2005).  Although other GEICO employees may not have actually been aware of the discovery responses, or Griott's warning that the deadline had been triggered, GEICO had a memorandum in its possession that warned of the deadline, and Griott knew that discovery responses had been received and believed that the deadline had begun.  Cf. National Farmers Union Property & Cas. Co. v. O'Daniel, 329 F.2d 60, 65 (9th Cir. 1964) (applying Montana law and holding that counsel's knowledge of insured's offer to contribute to settlement was imputed to insurer); Waters v. American Cas. Co., 73 So.2d 524, 532 (Ala. 1954) (trial attorney's knowledge of settlement offer imputed to insurer); Dumas v. Hartford Accident & Indem. Co., 56 A.2d 57, 61 (N.H. 1947) (same).  Third, the August 2009 timeline indicates that the deadline began to run on August 27, which is 5 days after the August 7 letter's 15-day deadline would have expired.  The insertion of the 15 day deadline in the August 7 letter reflects McDaniel's desire to settle for policy limits *quickly*.  Hand- delivering the

1  discovery responses on August 27 is consistent with an attempt to quickly resolve the case.

2  Delivering the responses with a notation that the "verification" was to follow but then never

3  providing a verification is inconsistent with attempting to settle the matter quickly.  Fourth,

4  GEICO's reliance on the portion of the interrogatory responses that indicated a verification was to

5  follow is not persuasive.  The verification conveys no substantive information, the interrogatory

6  responses were very similar to those McDaniel gave to Asuncion, and McDaniel never provided a

7  verification to GEICO.  The fact that McDaniel indicated that a verification was to follow, but

8  never actually provided one, shows that she was cognizant of the verification, but still wanted the

9  substance of the responses in GEICO's hands in order to start the deadline.  It is true that one

10  California court has indicated that unsworn interrogatory responses are tantamount to no responses

11  at all.  See Steven M. Garber & Assocs. v. Eskandarian, 150 Cal.App.4t h 813, 817 n.4 (2007).

12  However, it is not true that answers provided in an unverified response can serve no purpose.

13  Unverified responses can be used to impeach a witness.  See LeGrand v. Yellow Cab Co., 8

14  Cal.App.3d 125, 129 (1970).  Because an unverified interrogatory can serve a "non-discovery"

15  purpose, see id., it is unknown why the unsworn responses could not have started the settlement

16  clock in this case.  Fifth, GEICO does not explain what purpose was served by hand-delivering the

17  responses to Griott, if not to start the deadline.  If GEICO's argument that the unverified responses

18  do not legally constitute proper interrogatory responses is correct, then hand-delivering the

19  responses to Griott would be an empty and meaningless act.  Sixth, Nichols had hand-delivered

20  the August 7 letter to Griott at a deposition.  Hand delivering the discovery responses at a

21  deposition as the method for starting the settlement deadline is consistent with how the original

22  settlement offer was communicated in the first place.  Finally, there is no evidence that Nichols

23  intended to use the legal or technical definition of a complete interrogatory "response" when he

24  extended the deadline.  A technically "incomplete response" to interrogatories is still a type of

25  response.  Cf. LeGrand, 8 Cal.App.3d at 129.  As stated above, Griott clearly warned

26  Buenaventura in a memo that the deadline had begun once the responses had been hand-delivered

27  by Nichols.  The evidence indicates that the first time that the absence of a verification was raised,

28  and thus whether McDaniel had "responded" to GEICO's interrogatories, was around October 7,

2009, when GEICO began having internal discussions after Nichols told Buenaventura that the policy limits offer had lapsed. Prior to October 7, the absence of a verification did not appear to be on anyone's radar for any purpose, let alone for purposes of McDaniel's offer. Reliance on the absence of a verification smacks of an after the fact justification.[9]

It is true that Griott has declared that he viewed the responses as incomplete, and that if he had noticed the absence of a verification sooner, he would have contacted Nichols in order to obtain clarification about whether the deadline had started. However, if Griott had noticed the absence of a verification and spoke to Nichols, then Nichols would have confirmed that the deadline had begun. When Griott received the hand-delivered responses, he actually understood that the deadline had begun and so informed GEICO of that fact in a memo to Buenaventura. What would have been done differently if one additional question had been posed to Nichols from Griott is entirely unknown, given how Griott behaved when he actually believed that the deadline had started to run. The long and short of the situation is, at the relevant time, Nichols and Griott both understood that the deadline to accept the offer had begun when Nichols hand delivered the interrogatory responses. Because Griott was a GEICO employee and GEICO's attorney, and had sent another GEICO employee a memo on the subject, GEICO had been informed and knew that the deadline was running.

In sum, the Court sees one reasonable inference from the evidence. The evidence establishes that the parties knew that the settlement deadline had begun to run when Nichols hand-delivered the responses, yet GEICO did not timely accept McDaniel's offer. Summary judgment in favor of McDaniel on the issue of acceptance, or lack thereof, is appropriate.

    3.    <u>Breach Of The Covenant Of Good Faith & Fair Dealing</u>

"From the covenant of good faith and fair dealing implied by law in all contracts, and from the liability insurer's duty to defend and indemnify covered claims, California courts have derived an implied duty on the part of the insurer to accept reasonable settlement demands on such claims within the policy limits." <u>Hamilton v. Maryland Casualty Co.</u>, 27 Cal.4th 718, 724 (2002). In

---

[9] If GEICO truly believed that McDaniel's interrogatory responses were "no responses at all," then it seems likely that GEICO would have moved to compel McDaniel to respond. However, there is no evidence that GEICO did so.

determining whether to accept a settlement offer, the insurer "must take into account the interest of the insured and give it at least as much consideration as it does to its own interest." Comunale v. Traders & General Ins. Co., 50 Cal.2d 654, 659 (1958).  When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement, a consideration in good faith of the insured's interest requires the insurer to settle the claim. Crisci v. Security Ins. Co., 66 Cal.2d 425, 429 (1967); Comunale, 50 Cal.2d at 659.  Actual dishonesty, fraud, concealment or other types of "reprehensible conduct" is not necessary to impose liability. Johansen v. California State Auto. Assn. Inter-Ins. Bureau, 15 Cal.3d 9, 16 n.5 (1973); Crisci, 66 Cal.2d at 429.  "Liability is imposed not for a bad faith breach of the contract but for failure to meet the duty to accept reasonable settlements, a duty included within the implied covenant of good faith and fair dealing." Johansen, 15 Cal.3d at 16 n.7; Crisci, 66 Cal.2d at 429; Reid v. Mercury Ins. Co., 220 Cal.App.4th 262, 272-73 (2013).  "The governing standard is whether a prudent insurer would have accepted the settlement offer if it alone were to be liable for the entire judgment." Jonathan Neil & Assoc., Inc. v. Jones, 33 Cal.4th 917, 937 (2004); Egan v. Mut. of Omaha Ins. Co., 24 Cal.3d 809, 818 (1979).  If the terms of an offer are unclear, the insurer is obligated to seek clarification of the offer.  See Allen v. Allstate Ins. Co., 656 F.2d 487, 490 (9th Cir. 1981); Lincoln Gen. Ins. Co. v. Access Claims Adm'rs, Inc., 596 F.Supp.2d 1351, 1365 (E.D. Cal. 2009); Betts v. Allstate Ins. Co., 154 Cal.App.3d 688, 708 n.7 (1984); Croskey et al., Cal. Practice Guide: Insurance Litigation, (The Rutter Group 2014) ("Croskey"), ¶¶ 12:295-12:298.  If additional time is needed to investigate and assess an offer in good faith, the insurer should inform the claimant of the need for additional time.  See Critz, 230 Cal.App.2d at 798; Croskey at ¶ 12:347.  If an offer's time limit is reasonable, and the settlement offer itself is otherwise reasonable, but the insurer does not accept the offer within the time limit, then the insurer has breached the covenant of good faith and fair dealing and cannot escape liability by attempting to accept an expired or withdrawn offer.  See Croskey at ¶ 12:348; cf. Lincoln Gen., 596 F.Supp.2d at 1365 (denying summary judgment because evidence of the insurer's "failure to timely respond to the demand letter or at least seek clarification of any uncertainty, exposed [the insurer] to bad faith liability in excess of the policy limits."); Martin, 228 Cal.App.2d at 180-81,

185 (finding that allegations indicated a lack of good faith where a counter offer was rejected but the insurer attempted to accept the claimant's offer 3 days after the offer had expired).

Here, given the facts of the wrongful death case, there is no doubt and really no dispute that a reasonable insurer would have accepted McDaniel's offer.  See Egan, 24 Cal.3d at 818.  Indeed, GEICO itself later attempted to settle the case for the Policy's limits.  Instead of focusing on the reasonableness of the offer, GEICO focuses on its own conduct.  GEICO makes essentially three arguments:  (1) it never actually expressly rejected the settlement offer, (2) evidence that it put its interests above Murotani's is necessary and lacking, and (3) at most the evidence indicates negligence which is insufficient.  The Court is not persuaded.

GEICO relies on *Palmer v. Financial Indemnity Co.*, 215 Cal.App.2d 419, 428 (1963), *Ivy v. Pacific Auto. Ins. Co.*, 156 Cal.App.2d 652, 659 (1958), and *Brown v. Guarantee Ins. Co.*, 155 Cal.App.2d 679, 683 (1957), and those cases do indicate that negligence alone is insufficient to impose liability against an insurance company for not accepting a settlement.  However, these decisions pre-date *Crisci*, *Johansen*, *Egan*, and *Hamilton* which further clarified the duty imposed upon the insurer.

As quoted above, the California Supreme Court has explained that there exists an "implied duty on the part of the insurer to accept reasonable settlement demands on such claims within the policy limits."  Hamilton, 27 Cal.4th at 724.  "Liability is imposed not for a bad faith breach of the contract but for failure to meet the duty to accept reasonable settlements . . . ."  Johansen, 15 Cal.3d at 16 n.7; Crisci, 66 Cal.2d at 429; Reid, 220 Cal.App.4th at 272-73.  The key inquiry is not necessarily how the insurer weighed the insured's interests, rather the key inquiry is "whether a prudent insurer would have accepted the settlement offer if it alone were to be liable for the entire judgment."  Egan, 24 Cal.3d  at 818; see Crisci, 66 Cal.2d at 429.  Consistent with these cases, the applicable jury instructions identify the elements for a failure to settle claim as:  "(1) that the [plaintiff in the underlying case] brought a lawsuit against the [plaintiff/insured] that was covered by [the defendant's] insurance policy; (2) that the [defendant] failed to accept a reasonable settlement demand for an amount within policy limits; and (3) that a monetary judgment was entered against [the plaintiff/insured] for a sum greater than the policy limits."  CACI No. 2334.

1    Nowhere in CACI 2334, *Hamilton*, *Johansen*, *Egan*, or *Crisci* is there a requirement that a

2    plaintiff bring forth evidence of the insured's decision making process and that such evidence

3    must somehow reflect that the insurer placed its interests above the insured's interest.  Instead,

4    CACI 2334, *Hamilton*, *Johansen*, *Egan*, and *Crisci* recognize that there is a particular duty

5    imposed on an insurance company to accept reasonable settlement offers within policy limits.

6    When the insurance company fails to accept a reasonable offer, the duty has been violated.  See

7    Hamilton, 27 Cal.4th at 724; Egan, 24 Cal.3d at 818; Johansen, 15 Cal.3d at 16 n.7; Crisci, 66

8    Cal.2d at 429; Croskey at ¶ 12:348.

9         It is true that *Hamilton*, *Johansen*, and *Crisci* involve an insurer's affirmative/express

10   rejection of a settlement offer, and this case involves an offer that lapsed without an express

11   rejection.  What occurred in this case was GEICO's failure to analyze or consider the offer in any

12   fashion whatsoever while the offer remained open.  GEICO knew in March and May 2009 that

13   there was a likelihood of an excess judgment, knew that McDaniel was attempting to settle for

14   policy limits as of August 10, 2009, a GEICO employee (Griott) knew about the offer and

15   believed that the deadline had started on August 27, 2009, another GEICO employee

16   (Buenaventura) was notified in a memo that used bold and underlined text that the deadline had

17   begun, and yet the memo went unread and no further follow-up inquiries were made regarding

18   discovery or McDaniel's offer.  It is true that Buenaventura began the settlement process without

19   knowledge of the discovery responses on September 10, 2009.  However, Buenaventura was

20   aware on August 11 of McDaniel's August 7 settlement letter. It appears that GEICO had all the

21   information necessary to settle the case at latest on July 1, 2009 (the date McDaniel's discovery

22   responses to Asuncion's interrogatories were received).  No additional information appears to

23   have been received on September 10.  Despite the August 7 letter and the information in GEICO's

24   possession, Buenaventura/GEICO did not begin to act until a month later.  Given the information

25   in GEICO's possession and the August 7 letter, it is unknown why it was advisable to wait until

26   discovery was received, especially if Buenaventura was concerned about a "short" 10-day

27   deadline after receipt of discovery.  See DUF 18.I.  No explanation is given as to why GEICO did

28   not begin its internal settlement process nearer the time that it received the August 7 letter.

It is unclear why GEICO's failure to timely analyze the offer should serve as a defense to its breach of duty under the above circumstances.  Cf. Lincoln Gen., 596 F.Supp.2d at 1365-66.  If a reasonable offer is not accepted, and a judgment in excess of the policy limits is obtained against the insured, then the insured is damaged by the insurer's failure to accept the offer.  The damage suffered is the same whether the failure to settle was the result of a detailed analysis or a complete failure to conduct a timely analysis.  As long as an insurer is under a duty to accept reasonable settlement offers, then the failure to timely act while the reasonable offer remains open breaches the duty just as much as an express rejection of the offer that considered the insured's interests.  Cf. Lincoln Gen., 596 F.Supp.2d at 1366 (". . . bad faith liability exists to induce an insurer to protect the insured's financial interests; the insurer's conduct need not be grossly irresponsible or unreasonable to trigger bad faith liability."); J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co., 59 Cal.App.4th 6, 13 (1997) ("The gravamen of this species of bad faith lies in exposing the insured to a judgment for more money than the insurer is bound to indemnify . . . ."); Croskey at ¶ 12:348.

Both parties move for summary judgment on the cause of action for failure to accept a reasonable settlement offer.  McDaniel's August 2009 policy limits offer was a reasonable offer.  GEICO did not timely analyze the offer or accept the offer while the offer remained open, despite GEICO's knowledge that the case was one for settlement that likely would involve an excess judgment, that McDaniel was attempting to settle quickly, and knowledge of the deadline.  GEICO therefore breached its duty to accept a reasonable settlement offer.  See Hamilton, 27 Cal.4th at 724; Egan, 24 Cal.3d at 818; Johansen, 15 Cal.3d at 16 n.7; Crisci, 66 Cal.2d at 429; Croskey at ¶ 12:348; CACI 2334; cf. Lincoln Gen., 596 F.Supp.2d at 1365-66.  Summary judgment in favor of McDaniel on this issue is appropriate.

    4.     The *Shapero* Rule

        a.     Accrual Of Claim

Initially, there is a dispute about when the cause of action for failure to settle arose.  GEICO focuses on August 2011, the date that a judgment against Murotani's estate was entered.  McDaniel appears to focus on September 2009, which is the time that her settlement offer lapsed.

1  McDaniel contends that because GEICO did not accept the settlement offer while Murotani was

2  alive, Murotani's claim against GEICO for refusing to accept a reasonable settlement offer

3  survived his death.  McDaniel relies largely on *Avila v. Century Nat. Ins. Co.*, 473 Fed. Appx. 554

4  (9th Cir. 2012).

5          Generally, a cause of action against an insurer for the failure to accept a reasonable

6  settlement offer accrues when a final judgment in excess of the policy limits is entered against the

7  insured.  See Mercado v. Allstate Ins. Co., 340 F.3d 824, 827 (9th Cir. 2003); Safeco Ins. Co. v.

8  Superior Ct., 71 Cal. App.4th 782, 788 (1999).  However, an "insured may recover for bad faith

9  failure to settle, despite the lack of an excess judgment, where the insurer's misconduct goes

10  beyond a simple failure to settle within policy limits or the insured suffers consequential damages

11  apart from an excess judgment."  Howard v. American National Fire Ins. Co., 187 Cal.App.4th

12  498, 527 (2010).  Here, there is no evidence beyond a simple failure to settle by GEICO, nor is

13  there evidence that Murotani suffered consequential damages.  Without additional evidence, this

14  case represents a "typical" failure to settle case, which means that the claim accrued when

15  judgment was entered against the Estate in August 2011.  See Mercado, 340 F.3d at 827; Safeco

16  Ins., 71 Cal.App.4th at 788.

17          *Avila v. Century Nat. Ins. Co.* is not to the contrary.  In *Avila*, the Ninth Circuit looked to

18  California law to interpret and apply Nevada law.  See Avila, 473 Fed. Appx. at 556.  The *Avila*

19  Court stated that, under California law, "because Manuel Avila was alive when Century refused to

20  indemnify, defend, and settle, whether or not he had any assets at the time would be irrelevant to

21  Century's duty.  [*Shapero*, 14 Cal.App.3d at 438 n.1].  If Century breached its implied covenant

22  with Avila while Avila was alive, then, under Nevada law, the Estate would retain any such claims

23  as if Manuel Avila were still alive.  Nev. Rev. Stat. § 41.100(3)."  Id.  The Court recognizes that

24  this language is helpful to McDaniel, but the language is somewhat loose and does not explain

25  when Avila's claims actually accrued or whether Avila was actually alive when the judgment was

26  entered against him.  See id.  Further, there is no discussion of or citation to *Mercado* or *Safeco*

27  *Ins.*  Nevertheless, a review of the docket from the District of Nevada clarifies the issues.  The

28  *Avila* case was filed in the District of Nevada on April 16, 2009.  See Doc. No. 1 in Avila v.

1  Century Nat'l Ins. Co., 2:09-cv-682 RCJ GWF.[10]  The *Avila* complaint indicates that a judgment

2  against Manuel Avila was entered sometime in 2006.  See id.  On July 21, 2009, a Stipulation and

3  Order To Substitute the Estate Of Manual Avila As Plaintiff was filed in the Nevada District

4  Court.  See id. at Doc. No. 27.  This stipulation and order state that Manuel Avila died on April 1,

5  2009.  See id.  Therefore, the docket reflects that a judgment had been entered against Manuel in

6  2006, i.e. prior to his death on April 1, 2009.  See id. at Doc. Nos. 1, 27.  Here, unlike in *Avila*,

7  Murotani had been deceased for well over a year by the time a judgment was entered against the

8  Estate.  See JUF's 24, 27.  *Avila* does not support McDaniel's position.

9       McDaniel's failure to settle claim accrued in August 2011.  See Mercado, 340 F.3d at 827;

10  Safeco Ins., 71 Cal. App.4th at 788.

11            b.    Application Of *Shapero*

12       GEICO argues that the rule of *Shapero* applies because, in August 2011, the Estate had no

13  assets.  In *Shapero*, an insurer represented an estate in a case involving a fatal car collision, but

14  refused the plaintiff's policy limits settlement offer.  See Shapero v. Allstate Ins. Co., 14

15  Cal.App.3d 433, 435-36 (1971).  A judgment in excess of the policy limits was obtained, and the

16  estate subsequently assigned its bad faith claims to the plaintiff.  See id.  In the trial that followed,

17  a jury rendered a verdict in favor of the insurer.  See id. at 436.  The issue on appeal was whether

18  it was proper for the trial court to instruct the jury that they could consider the fact that the estate

19  had no assets.[11]  See id.  The *Shapero* court noted that the "record is . . . clear that, long prior to

20  the trial of the injury action, everyone concerned recognized that a judgment against [the estate]

21  would produce nothing except the Allstate insurance."  Id.  In upholding a defense verdict in the

22  bad faith action, the court observed that the insurer "could not be found guilty of bad faith for

23  accepting as a working hypothesis the fact which was also assumed by the personal representative

24  of its assured -- that the estate had no interest, no financial stake in the outcome of the litigation,

---

25  [10] The Court takes judicial notice of the docket in this case.  See Fed. R. Evid. 201; Trigueros v. Adams, 658 F.3d 983,
26  987 (9th Cir. 2011).

27  [11] The Court notes that the estate involved in *Shapero* had a $500 burial insurance policy as an asset.  However,
   because the Probate Code gives funeral expenses priority over all other debts (except expenses of administration), it
28  was "apparent that this small sum could never have been made available for other purposes."  Shapero, 14 Cal.App.3d
   at 436.

and no assets which would be exposed to risk by a failure of Allstate to settle." Id. at 438.  The

California Supreme Court summarized *Shapero* as follows:  "The insured died leaving no asset

other than the insurance policy. Thus, a judgment in excess of policy limits presenting no risk to

the insured or to his heirs, the insurer had no duty to settle within policy limits."  Murphy v.

Allstate Ins. Co., 17 Cal.3d 937, 941 (1976).

Whether GEICO can avoid liability altogether under *Shapero* depends on whether the

Estate had any assets.  See id.  In the probate proceedings for the Estate, three assets were

identified:  (1) $50,000 in life insurance policies and annuities; (2) the Chase Bank account with

approximately $10,000 in funds; and (3) $2,500 of miscellaneous furniture and electronic

equipment.  See JUF's 29, 30.

Although $50,000 in life insurance policies and annuities is identified, the parties focus

only on an annuity from Pacific Life Insurance Company that had a death benefit of $41,429.18.

See DUF's 35, 37.  Murotani identified his three siblings as the beneficiaries of this annuity.  See

DUF 36.  McDaniel does not address this annuity.  As a result, there appears to be little dispute

that the annuity was not actually an Estate asset because, upon Murotani's death, the money from

the annuity was to go to Murotani's sister and two brothers as beneficiaries.  Because the money

transferred to the three beneficiaries upon Murotani's death, the annuity was never an asset of the

Estate.  See Cal. Prob. Code § 5000(a); Western Nat'l Life Ins. Co. v. Woldemariam, 2013 U.S.

Dist. LEXIS 2951, *9-*12 (N.D. Cal. Jan. 8, 2013); Estate of Petersen, 28 Cal.App.4th 1742, 1751

(1994).

The parties more vigorously dispute the $10,000 in the Chase Bank account, which was

closed and emptied after Murotani's death, but before the excess judgment was entered against the

Estate.  GEICO argues that the bank account was a type of joint account between Murotani and his

brother Leland, and as a result the money in the account was Leland's irrespective of probate.

McDaniel, on the other hand, argues that the evidence does not show that the bank account was a

joint account, that Leland made material misrepresentations in filling out a form to obtain the bank

account funds, and that the Estate could initiate a claim against Leland for the funds under Probate

Code § 13109.  The Court cannot agree entirely with either party's position.

With respect to GEICO's argument, GEICO relies on the deposition testimony of Ronald Murotani.  See DUF 32.  In relevant part, Ronald testified that he did not receive any of the bank account money, he "believed" that Leland received all of the bank account money, he "thought" that Leland got the money because Leland and Murotani lived in the same house, "thought" Murotani sometimes needed to have someone take care of his financial things, and "thought" Murotani wanted to have Leland on the account in case he needed to take care of any situations. See Ronald Murotani Depo. 15:18-17:10.  However, Ronald also testified that "as far as he knew" Murotani had a checking account, but he did not know the amount in the account or which bank the account was with, and that Leland would know where the account was held.  See id.  The Court agrees with McDaniel that Ronald's evidence is too speculative to be probative of the status of the bank account.  It is apparent that Ronald had little personal knowledge of the bank account, had few concrete facts, and was indicating that Leland was the person who did have the relevant knowledge.  Moreover, none of the bank documents submitted by the parties indicate that Leland's name was in any way on the account or that Leland had any rights to the account immediately upon Murotani's death.  Leland's conduct in filling out the "Small Estate Declaration" to obtain the funds from Chase is contrary to having a right of access to the account. At best, Ronald's testimony represents merely "colorable" evidence, and that is insufficient.  See Anderson, 477 U.S. at 249-50; Hardage, 427 F.3d at 1183.

With respect to McDaniel's arguments, as explained above, Ronald's testimony is not probative.  Further, McDaniel is correct that there are false statements on the form that Leland filled out in order to obtain the bank account funds.  Contrary to Leland's representations, a probate estate had been opened and there were heirs other than Leland.  See JUF 25; DUF 33. However, the Court cannot agree that the Estate had a claim against Leland under Probate Code § 13109.

In pertinent part, § 13109 reads:  "A person to whom payment, delivery, or transfer of the decedent's property is made under this chapter is personally liable . . . for the unsecured debts of the decedent.  Any such debt may be enforced against the person in the same manner as it could have been enforced *against the decedent* if the decedent had not died."  Cal. Prob. Code § 13109

1   (emphasis added).[12]  The plain language of § 13109 indicates that a transferee stands in the shoes

2   of the decedent.  As such, it appears that § 13109 is meant to provide unsecured creditors with a

3   limited remedy to proceed against a transferee.  See Massoyan v. Otto, 2013 Cal.App. Unpub.

4   LEXIS 7783, *22 (2013) ("[Sections 13109] and 13550 are based on the same principle:

5   Creditors have recourse not only against decedents' estates, but also against those to whom a

6   decedent's property has passed without administration.") (emphasis added).[13]  The language of

7   § 13109 on its face does not authorize the estate to bring a claim against the transferee.

8         Nevertheless, Probate Code § 13111 provides in pertinent part that, if proceedings for the

9   administration of a decedent's estate have been commenced, and if property has been transferred

10  to a person pursuant to Probate Code § 13000 et seq., then the transferee is liable to the estate for

11  restitution of the property, including any income received from the property.  See Cal. Prob. Code

12  § 13111(a).  Here, by August 12, 2010, probate proceedings for the Estate had commenced.  See

13  JUF 25.  On August 13, 2010, Leland Murotani filed a Small Estate Declaration[14] with Chase

14  Bank to obtain the funds in the account, and appears to have obtained the funds that day.  See

15  DUF 33.  Because administration of the Estate had commenced prior to August 13, 2010, the

16  Estate could have obtained restitution of the approximately $10,000 from Leland.  See Cal. Prob.

17  Code § 13111(a).  Further, there is a 3-year limitations period for claims under § 13111, which

18  means that the Estate could have sought restitution after judgment was entered against it on

19  August 16, 2011.  See Cal. Prob. Code § 13111(e).[15]  Because the Estate had a claim for restitution

20  against Leland as of August 2011, the Court concludes that the value of the Chase Bank account

21  was an asset of the Estate.

22

23  [12] The Court notes that a person's liability under § 13109 is limited.  "[T]he aggregate of the personal liability of a
24  person under Section 13109 . . . shall not exceed the fair market value . . . of the property paid, delivered, or
    transferred to the person . . . ."  Cal. Prob. Code § 13112(b).

25  [13] Despite state rules, the Court may consider unpublished cases as persuasive authority.  See Employers Ins. of
    Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); Altman v. HO Sports Co., 821 F.Supp.2d
26  1178, 1189 n.14 (E.D. Cal. 2011).

27  [14] The Small Estate Declaration indicates that it is pursuant to Probate Code §§ 13100-13116, 12570.  See GEICO Ex.
    C000025.

28  [15] The Court notes that the 3-year limitations period is not subject to tolling.  See Cal. Prob. Code § 13111(e).

Finally, the parties do not address the $2,500 in furniture and electronic equipment. These assets were identified later in the probate proceedings and after the judgment was entered against the Estate. See JUF 30. These assets would have been in existence at all relevant times. Without any additional arguments on the topic, the Court concludes that the Estate included assets of $2,500 worth of miscellaneous chattels.

In sum, based on the evidence presented, the Court concludes that the Estate had assets worth approximately $12,500 exclusive of the GEICO policy at the time of the August 2011 judgment. Although modest in size, the Court cannot conclude that the Estate had no assets. Therefore, GEICO's liability is not extinguished under *Shapero*. See Shapero, 14 Cal.App.3d at 438 n.1. Summary judgment in favor of GEICO on this issue is not appropriate.

5.   Limitation Of Recovery Under *Shapero* Rationale

The rule in California is that an "insurer that breaches its duty of reasonable settlement is liable for all the insured's damages proximately caused by the breach, regardless of policy limits." Hamilton, 27 Cal.4th at 724. Ordinarily when there has been an excess judgment entered against the insured, the insurer is liable to the insured for the entire amount of the judgment. See id. That is, generally "damages in the amount of the excess judgment are, without further demonstration, the measure of recovery for bad faith failure to settle," and prepayment of the excess award by the insured is not required. Purdy v. Pacific Auto. Ins. Co., 157 Cal.App.3d 59, 74 (1984).

As discussed above, *Shapero* recognizes an exception to this rule when the insured is a decedent's estate and the estate has no assets. See Shapero, 14 Cal.App.3d at 438. In such a case, there is no recovery. See id. The rationale behind *Shapero* was that because the insurance was the only estate asset at risk, an excess judgment against the estate could not harm the estate. See Murphy, 17 Cal.3d at 941; Shapero, 14 Cal.App.3d at 438. However, the *Shapero* court noted that its analysis did not necessarily mean that an insolvent estate could never recover. Shapero, 14 Cal.App.3d at 438 n.1. "Where assets exist, the interests of the estate are involved, and [the estate] may be subjected to financial harm to the detriment of the general creditors."[16] Id. This

---

[16] The *Shapero* rule also does not apply to a living person. See Garamendi v. Golden Eagle Ins. Co., 2006 Cal. App. Unpub. LEXIS 10043, *36 (Nov. 3, 2006); Purdy, 157 Cal.App.3d at 73-74; Shapero, 14 Cal.App.3d at 438 n.1.

language has been interpreted to mean that if the estate's assets (other than the insurance policy) had been at risk, then *Shapero*'s result would have been "different." Garamendi v. Golden Eagle Ins. Co., 2006 Cal. App. Unpub. LEXIS 10043, *35 (Nov. 3, 2006). *Shapero* itself, as well as *Garamendi*, recognizes a key distinction when an estate has assets besides the insurance policy that are put in jeopardy by an excess judgment.

No California cases have been cited by GEICO that directly address whether *Shapero*'s rationale should be extended so that damages would be limited to the value of the insured estate. GEICO does cite *Bourget v. GEICO*, 456 F.2d 282 (2d Cir. 1972) in arguing that the value of the estate's assets should set the limit of any recoverable damages for an excess judgment. *Bourget* recognized the "conflict between the insurer's interest to pay less than the policy limits and the insured's interest not to suffer liability for any judgment exceeding them," and that this conflict "measures" the extent of the insurer's duty to accept a reasonable settlement offer. Id. at 285. In the "rare case" when the insured has no such interest, the *Bourget* court held that there is no conflict and the duty to accept does not arise. Id.

The Court is not persuaded by GEICO's reliance on *Bourget*. First, *Bourget* did not actually address a situation in which an estate had very modest assets. Rather, the situation in *Bourget* was similar to that of *Shapero* – an estate whose only asset was consumed by higher priority claims. See id. Second, when *Bourget* stated that the conflict between an insurer and an insured "measures" the extent of the insurer's duty, it appears that the Second Circuit was expressing that the conflict should guide how an insurer is to behave in meeting its duty. See id. There was no discussion of damages for a solvent estate or a living person. See id.

On the other hand, McDaniel cites *Economy Fire & Cas. Co. v. Collins*, 643 N.E.2d 382 (Ind. Ct. App. 1994) in her opposition. *Economy Fire* is inconsistent with the rule that GEICO is advocating. In that case, the Indiana Court of Appeals adopted the "judgment rule," and held that the damages recoverable were the amount of the excess judgment and not the loss that was actually suffered by the estate. See id. at 384-86. *Economy Fire* is not alone in its holding.

A significant number of cases from other jurisdictions have held that estates that either have insufficient assets or no assets may obtain the entire excess judgment in a failure to settle

1   case.  E.g. Torrez v. State Farm Mut. Auto. Ins. Co., 705 F.2d 1192, 1197-1201 (10th Cir. 1982)

2   (applying New Mexico law after examining cases from other jurisdictions); Lee v. Nationwide

3   Mut. Ins. Co., 286 F.2d 295 (4th Cir. 1961) (applying Maryland law); O'Daniel, 329 F.2d 60, 65

4   (9th Cir. 1964) (applying Montana law); Carter v. Pioneer Mut. Cas. Co., 423 N.E.2d 188, 191

5   (Ohio 1981); Wolfberg v. Prudence Mut. Cas. Co., 240 N.E.2d 176, 180 (Ill. Ct. App. 1968);

6   Henke v. Iowa Home Mut. Cas. Ins. Co., 97 N.W.2d 168, 180-81 (Iowa 1959).  One court has

7   found that a "solvent estate" may "pursue an excess judgment against the insurer since the

8   interests of the estate are involved and a full and fair recovery enables the fiduciary of the estate to

9   distribute assets free from the claim of the holder of the excess judgment."  Carter, 423 N.E.2d at

10  191 (citing *Wolfberg* and *Henke*); cf. Shapero, 14 Cal.App.3d at 438 n.1.

11          *Shapero*'s rule (no recovery of an excess judgment when the insured is an insolvent estate)

12  has been discussed without objection by the California Supreme Court and has been cited by lower

13  California cases.  In the 43 years since *Shapero* was decided, it does not appear that California

14  courts have expanded on *Shapero*'s rationale.  Instead, cases such as *Hamilton* and *Purdy* have

15  confirmed the general rule that the measure of damages in a failure to settle case is the amount of

16  the excess judgment.  Also, *Shapero* itself appears to have put a limit on its reach through

17  Footnote 1.  See Shapero, 14 Cal.App.3d at 438 n.1.  *Shapero*'s Footnote 1 indicates a different

18  result is called for when an estate's assets are in jeopardy, which is consistent with *Carter*'s

19  observation regarding solvent estates.  Cf. id. with Carter, 423 N.E.2d at 191.   *Shapero* appears to

20  be limited to its facts, not only by other California decisions, but by *Shapero*'s own language.

21  Given these considerations, the Court declines to extend *Shapero*'s holding and rationale to cases

22  in which an estate is not insolvent.

23          Instead, the Court holds that when an insured estate is solvent and has a claim for failure to

24  settle against its insurer, the measure of damages is the excess judgment.  See Carter, 423 N.E.2d

25  at 191; Shapero, 14 Cal.App.3d at 438 n.1; cf. O'Daniel, 329 F.2d at 66; Garamendi, 2006 Cal.

26  App. Unpub. LEXIS 10043 at *36; Purdy, 157 Cal.App.3d at 74.  Therefore, summary judgment

27  in favor of GEICO on this theory is not appropriate.

28

34

**CONCLUSION**

Both parties move for summary judgment.  After examining the evidence and arguments presented, the Court finds that summary judgment in favor of McDaniel is proper.  The evidence shows that McDaniel made a reasonable settlement offer, GEICO was aware of the offer, and the offer lapsed.  The evidence also shows that McDaniel's attorneys did not have authority to enter into the "in-trial settlement," and GEICO's attorney was so told.  Because McDaniel did not consent to the settlement, there was no agreement.  With respect to the *Shapero* rule, the evidence indicates that the Estate had about $12,500 worth of assets.  Because the Estate had assets, the *Shapero* rule does not apply.  Finally, the Court cannot agree to extend the rationale of *Shapero*.  GEICO has identified no California cases that have extended *Shapero*, and *Shapero*'s own language limits its reach.  Limiting *Shapero* to an estate without assets is consistent with both *Shapero*'s language and the practice of other jurisdictions.  The Court will not extend *Shapero*.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment is GRANTED;

2. Defendant' motion for summary judgment is DENIED;

3. Within 10 days of service this order, Plaintiff shall submit a proposed judgment accompanied by a memorandum in support of the amounts claimed;

4. Within 7 days of service of Plaintiff's proposed judgment, Defendant may file a responding brief;

5. Plaintiff's request for costs shall be filed separately in accordance with Local Rule 292;

6. All currently set dates are VACATED.

IT IS SO ORDERED.

Dated:   September 24, 2014                    _____

                    SENIOR  DISTRICT  JUDGE